**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| CYANDIA, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 2:24-CV-00096-JRG |
| | § | |
| SAP AMERICA, INC. and SAP SE, | § | |
| | § | |
| Defendants. | § | |

**CLAIM CONSTRUCTION ORDER**

In this patent case, Cyandia, Inc., alleges infringement by SAP America, Inc., and SAP SE (together, "SAP") of claims from four related patents directed to "information convergence." Three of the patents—U.S. Patents 8,499,250, 8,578,285, and 8,595,641—share the same specification. *See* '641 Patent at [63] (noting the underlying application is a continuation the application from which the '250 Patent issued); '285 Patent at [63] (same). The fourth patent, U.S. Patent 8,751,948, issued from a continuation-in-part of the application from which the '250 Patent issued. *See* '948 Patent at [63].

The parties present about two dozen claim-construction disputes, with SAP challenging 11 terms as indefinite. Having considered the parties' briefing, along with arguments of counsel at an April 24, 2025 hearing, the Court resolves those disputes as follows.

## I. BACKGROUND

The patents address the problem of "[d]issimilar evolutions of device interfaces" on different types of platforms. '250 Patent at 1:30–31. At the time of the invention, "[i]information users [were] wasting their time locating, putting into context, consolidating, managing multiple versions

of, and understanding what [information was] truly meaningful." *Id.* at 3:31–34. "Consumers [had] a problem meaningfully understanding and efficiently consuming the vast amount of content" available at the time. *Id.* at 3:36–38.

To help address this problem, the patent teaches "a common and efficient utility . . . to interact with multiple information forms across multiple types of computers, interactive displays, and communication devices . . . in a more effective and efficient manner." '250 Patent at 3:40–43. To do this, the methodology establishes a "channel grid framework" on a first device that provides access to applications as "channels." *Id.* at 1:67–2:3. The channel content is based on the user, who can then select a channel from the grid and "deploy" the channel to a second platform. *Id.* at 3:66–4:8.




FIG. 3

Figure 3 (above) shows an embodiment of a channel grid framework (201) on a laptop (300). The laptop displays the framework as a twelve-channel display layout, and any type of information or content may be assigned to any channel (202). An application host and transfer tool (203) allows individual channels (202) of the framework (201) to be "dragged and dropped" out

of the framework and into the tool. That causes the server to download a copy of the channel into the transfer tool. Channels (202) in the transfer tool (203) can be transferred to other devices by "dragging and dropping" the channel (202) onto one of the device icons (204–206), each of which represents a different device. The system then downloads the channel to the corresponding device. *See generally* '250 Patent at 6:1–7:32.

Claim 1 of the '250 Patent is directed to "computer-readable storage media" containing instructions for executing this process. The claim recites:

> 1. A non-transitory computer-readable storage media for interacting with multiple information forms across computing devices, the computer-readable storage media including computer-readable instructions configured to cause one or more computer processors to execute the operations comprising:
>
> authenticating a user and a first platform associated with the user;
>
> establishing a channel grid framework for the user on the first platform, the channel grid framework including a matrix of elements, wherein each element represents a secure user-centric channel providing access to a first computer application, wherein the secure user-centric channel is displayed on a display device of the first platform; and
>
> deploying the secure user-centric channel from the channel grid framework on the first platform to a second platform associated with the user in response to a user selecting the secure user-centric channel from the channel grid framework on the first platform and performing a copy operation of the secure user-centric channel to the second platform, wherein deploying the secure user-centric channel comprises:
>
> A) establishing a user profile identifying user preferences, platform identities, and service support instructions that determine how the secure user-centric channel behaves on at least the second platform;
>
> B) identifying the second platform to which the channel is

to be deployed;

C) authenticating the second platform to receive the secure user-centric channel based at least in part on a second platform identity for the second platform; and

D) if the user, the first platform, and the second platform are authenticated, transmitting to the second platform data used to deploy the secure user-centric channel, wherein the transmitted data is configured to provide access to the first computer application on the second platform, and wherein the transmitted data is configured to cause services that are enabled by the secure user-centric channel on the second platform to be based at least in part on information access rights and/or security protocols respectively associated with the secure user-centric channel, the user, and the second platform, wherein the user selecting the channel from the channel grid framework on the first platform and performing the copy operation of the channel to the second platform includes performing a drag and drop operation, wherein said drag and drop operation causes the channel to be deployed on the second platform based at least in part on the user profile, and wherein at least a portion of the data transmitted to the second platform is based at least in part on the user profile.

’250 Patent at 14:58–15:43. Claim 1 of the ’285 Patent and ’641 Patent include similar language and concepts. *See, e.g.*, ’285 Patent at 15:2–67 (directed to “[a]n apparatus to provide secure user-centric information via a plurality of user platforms operated by a user”); ’641 Patent at 15:2–64 (directed to “[a]n apparatus serving as a user platform operated by a user to facilitate display of, and interaction with, secure user-centric information”).

U.S. Patent 8,751,948 has a similar disclosure but is more specifically directed to “alerts.” ’948 Patent at [54] (“Methods, Apparatus and Systems for Providing and Monitoring Secure Information Via Multiple Authorized Channels and Generating Alerts Relating to Same”). As the

Abstract explains:

> Channel information is monitored to determine one or more events, conditions, logical workflows, discrete information values or signal data, based on one or more threshold conditions or parameters relating to the channel information. Actionable and/or nonactionable alerts may be generated on one or more authenticated user devices and/or other devices.

’948 Patent at [57]. The first part of Claim 1 is similar to Claim 1 of the ’285 Patent, but recites the additional steps of:

> E) monitoring at least the first channel information so as to determine one or more events, conditions, logical workflows, discrete information values or signal data, based on at least one threshold condition or parameter relating to the first channel information and determined based on the user preferences indicated by the configuration data; and
>
> if the one or more events, conditions, logical workflows, discrete information values or signal data is/are determined in E):
>
> F) determining a notification method by which to provide at least one alert on the at least one external device based on the current state of the at least one external device indicated by the session data;
>
> G) generating notification data according to the determined notification method, wherein the notification data is configured to cause the at least one external device to provide the at least one alert on the at least one external device; and
>
> H) controlling the at least one communication interface to transmit the notification data to the at least one external device via the first channel without being requested by the user, wherein the transmission of the notification data to the at least one external device is based at least in part on information access rights and/or security protocols respectively associated with the corresponding plurality of authorized channels, the user, and the at least one user platform.

’948 Patent at 31:54–32:15.

## II. LEGAL STANDARDS

### A. Generally

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g,* 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B. Means-Plus-Function Claiming[1]

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112 ¶ 6 (pre-AIA); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). Under 35 U.S.C. § 112 ¶ 6, a structure may be claimed as a "means . . . for performing a specified function," and an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002). When it applies, § 112 ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described

[1] The patents at issue have effective filing dates before the effective date of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 3, 125 Stat. 284, 285-93 (2011). The Court, therefore, refers to the pre-AIA version of the statute.

in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347.

But § 112 ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112 ¶ 6 applies when the claim language includes "means" or "step for" terms, and a rebuttable presumption it does *not* apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348. These presumptions stand or fall according to whether one of ordinary skill in the art would understand the claim with the functional language to denote sufficiently definite structure or acts for performing the function in the context of the entire specification. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (noting § 112 ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Masco Corp.*, 303 F.3d at 1326 (noting § 112 ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Commc'ns, LLC v. I.T.C.*, 161 F.3d 696, 704 (Fed. Cir. 1998) (noting § 112 ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . even if the claim uses the term 'means'" (quotation marks and citation omitted)).

If § 112 ¶ 6 applies, construing the limitation involves multiple steps. "The first step . . . is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "The next step is to determine the corresponding structure described in the specification and equivalents thereof. Structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* (citations and

quotations omitted). The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). But § 112 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

"[S]tructure can be recited in various ways, including [by using] 'a claim term with a structural definition that is either provided in the specification or generally known in the art,' or a description of the claim limitation's operation and 'how the function is achieved in the context of the invention.'" *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1366 (Fed. Cir. 2022) (quoting *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1299 (Fed. Cir. 2005)). For § 112 ¶ 6 limitations implemented by a programmed general-purpose computer or microprocessor, the corresponding structure described in the patent specification must usually include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). In that case, the corresponding structure is not a general-purpose computer but rather the special-purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### C. Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The claims "must be precise enough to afford clear notice of what is claimed" while recognizing that "some modicum of uncertainty" is inherent due to the limitations of language. *Id.* at 909.

"Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). And in the context of § 112 ¶ 6, "[t]he party alleging that the specification fails to disclose sufficient corresponding structure must make that showing by clear and convincing evidence." *TecSec, Inc. v. IBM*, 731 F.3d 1336, 1349 (Fed. Cir. 2013) (quoting *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1380–81 (Fed. Cir. 2001)).

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, neither party offers a level of ordinary skill in its briefing. Cyandia, however, offers its expert's opinion that a skilled artisan at the time of invention "would have had a Bachelor's degree in electrical engineering, computer science, or the like, and/or four or more years of experience in server-based applications." Goodrich Decl., Dkt. No. 75-5 ¶ 14. SAP's expert testified that a skilled artisan would have had "a bachelor's degree in computer science or some equivalent field . . . and at least two years of experience probably with user interfaces for networked applications, particularly to manage and access information . . . ." Terveen Depo. Tr., Dkt. No. 78-10 at 119:7–21. SAP, however, notes "neither party asserts that the different articulations affect any of the issues and disputes." Dkt. No. 78 at 1 n.1. Given that, the Court will only address the

differences between the levels of ordinary skill to the extent necessary to resolve the disputes.[2]

## IV. THE DISPUTED TERMS

### A. Term 1[3]: "secure user-centric" ('250 Patent, Claims 1, 25; '285 Patent, Claims 1, 13, 37, 42; '641 Patent, Claims 1, 2, 13, 18, 31, 32; '948 Patent, Claims 1, 13, 35, 36)

| Cyandia's Construction | SAP's Construction |
|---|---|
| Plain and ordinary meaning<br>"secure and putting the experience of the user at the center of the design" (Dkt. No. 75 at 3) | "tailored to a specific authenticated user" |

Claim 1 of the '250 Patent recites "establishing a channel grid framework for the user on the first platform, the channel grid framework including a matrix of elements, wherein each element represents a secure user-centric channel providing access to a first computer application, wherein the *secure user-centric* channel is displayed on a display device of the first platform." '250 Patent at 14:66–15:5 (emphasis added). The parties present disputes about both "secure" and "user-centric."

#### *1. "Secure"*

Cyandia suggests information is "secure" when it is simply stored in a database. Dkt. No. 75 at 4. But the language to which Cyandia cites characterizes that specific database as "secure." '948 Patent at 15:65–16:1 (noting "information may be stored in a secure and specific database 219"). SAP points to the specification as "defin[ing] access control—specifically, *who* is permitted

[2] Neither proposal is particularly helpful. With his use of "and/or," Dr. Goodrich's proposed level of skill ranges from someone fresh out of engineering school to someone without an engineering degree but decades of experience. SAP's proffered level of ordinary skill is also unbounded so far as experience is concerned.

[3] The term numbers are from the Amended Joint Claim Construction Chart, Dkt. No. 73.

to access the channel (i.e., a specific authenticated user), on *which device* (i.e., the user's authenticated device), and *what* information is accessible." Dkt. No. 78 at 2.

"Secure," which modifies "channel," means the channel cannot be accessed without authorization. *See* https://www.yourdictionary.com/secure ("Free from the risk of being intercepted or listened to by unauthorized persons."). Prior authentication of a user or device might be required as part of that authorization, but they are distinct concepts. The Court construes "secure" as "requiring authorization for access."

*2. "User-Centric"*

Cyandia says "user-centric" means putting the experience of the user at the center of the design. Dkt. No. 75 at 3–4 (citing '250 Patent at 4:4–25). SAP, as support for its "tailoring" requirement, cites the '250 Patent's explanation that "[i]nformation may be delivered to a user based on the user's identity." '250 Patent at 3:66–4:3 ("Because the user is known and authenticated, preferences and rights to certain information types can be defined and managed for the user.").

SAP's position is generally better. Cyandia's "experience of the user" does not reference information or channels, and could be broad enough to read on something other than channel content. The specification explains "information may be delivered to a user based on the user's identity." '250 Patent at 3:66–67. Thus, "user-centric" means the selection of information or content is "based on the identity of, and relevant to, a user."

* * *

The Court construes (1) "secure" as "requiring authorization for access," and (2) "user-centric" as "based on the identity of, and relevant to, a user."

**B. <u>Term 2</u>: "channel" ('250 Patent, Claims 1, 2, 4, 6, 9, 13, 14, 25, 26, 30; '285 Patent, Claims 1, 6, 9, 13, 18, 36, 37, 42; '641 Patent, Claims 1, 2, 13, 16, 18, 31, 32, 34; '948 Patent, Claims 1, 7, 11, 13, 35, 36)**

| Cyandia's Construction | SAP's Construction |
|---|---|
| "a conduit for accessing and interacting with information, comprising a visual component to be presented on the at least one user [platform/device] and an integration component on an application server" | "mechanism for providing the user access to and/or interaction with user-centric information, comprising a visual component presented on the user device(s) and an information delivery component on a server" |

Claim 1 of the '250 Patent recites "establishing a channel grid framework for the user on the first platform, the channel grid framework including a matrix of elements, wherein each element represents a secure user-centric *channel* providing access to a first computer application." '250 Patent at 14:66–15:5 (emphasis added). As shown by their constructions, the parties agree a "channel" has a visual component that is presented on the platform, and some type of associated component on a server. But they disagree on the proper wording for that component, and whether the "channel" is best described as a "conduit" or a "mechanism."

*1. Whether a "channel" is a "conduit" or "mechanism"*

To support its "conduit" construction, Cyandia points to the '948 Patent's disclosure that "the channel is a conduit for delivering information to a user (e.g., providing access to and interaction with information)." Dkt. No. 75 at 6 (quoting '948 Patent at 8:63–66). SAP responds that the '948 Patent issued from a continuation-in-part application that introduced new matter relative to the other patents. Dkt. No. 78 at 3. It says "'conduit' implies a continuously open pathway—akin to a PVC pipe—through which data constantly flows," which is inconsistent with both the claims and the specification. *Id.* at 4 (noting "the specification explicitly states that channels can be represented as static icons").

The Court sees little difference between "conduit" and "mechanism" and therefore opts for the language found in the intrinsic record. To the extent SAP is concerned "conduit" requires data

to constantly flow, the Court disagrees. Using SAP's PVC-pipe analogy, the pipe is simply the structure that enables the flow—it does not require it. Thus, Cyandia's "conduit" language does not exclude channels that can be represented as static icons, which are located at one end of an information path between a server and the user device.

2. *Whether a "channel" is an "integration component" or "information delivery component"*

SAP calls "[t]he distinction between these two concepts . . . thin." Dkt. No. 78 at 4. The basis for its choice is ease of understanding for the jury. *Id.* (citing '250 Patent at 5:32–6:33). Cyandia objects that nothing in the record suggests that "integration" and "information delivery" mean the same thing. Dkt. No. 75 at 7; *see also* Dkt. No. 80 at 4 ("SAP provides no guidance as to what an 'information delivery component' is, which could lead to juror confusion.").

The channels are about providing information from the server to a user, which requires the delivery of information. Cyandia complains about the vagueness of SAP's proposal of "information delivery component," but its proposal of "integration component" is just as vague. Ultimately, the Court agrees with SAP that the difference between these constructions is minimal, if not non-existent, and opts for the term more understandable by a layperson—"information delivery component."

Based on the foregoing, the Court construes this term as "a conduit for accessing and interacting with information, comprising a visual component to be presented on the at least one user [platform/device] and an information delivery component on an application server."

### C. Term 6: "a user profile [identifying / to identify] . . . platform identities" ('250 Patent, Claims 1, 13, 25); ('285 Patent, Claims 1, 37, 42; '641 Patent, Claims 1, 31, 32; '948 Patent: Claims 1, 35, 36)

| Cyandia's Construction | SAP's Construction |
| --- | --- |
| Plain and ordinary meaning | "a personalized profile that registers specific devices to the user" |

Claim 1 of the '250 Patent recites "establishing a user profile identifying user preferences, platform identities, and service support instructions that determine how the secure user-centric channel behaves on at least the second platform." '250 Patent at 15:14–17. The parties present two disputes: (1) whether "identifying" platform identities requires registration, and (2) whether "platform identities" means specific devices (as SAP urges) or something broader, like device types or manufacturers.

Starting with the second dispute, Cyandia says a requirement to identify a specific device, as opposed to a type or brand of device, runs contrary to the intrinsic record. Instead, "[t]he specification describes the 'platform' . . . as 'multiple types of computers, interactive displays, and communication devices'." Dkt. No. 75 at 8 (quoting '250 Patent at 3:39–43). Moreover, says Cyandia, Claim 8 of the '285 Patent recites that a platform can be identified by any one or more of a device name, type, manufacturer, model number, serial number, IP, address, user or password. *Id.* (citing '285 Patent at 17:1–10).

The Court disagrees. The underlying need is "a common and efficient utility . . . to interact with multiple information forms across multiple types of computers, interactive displays, and communication devices ('platforms')." '250 Patent at 3:39–43. This suggests each of a computer, an interactive display, and a communication device is a *type of* platform—not an *identity* of a platform. The patent later confirms as much:

> The term "platforms" should be broadly interpreted to include, by way of non-limiting example, computers, communication devices, and other computing devices. Non-limiting examples include servers, networks of servers, desktop computers, laptop computers, tablet computers, netbook, computing devices, telephones, cell phone devices, handheld devices, smart phones, interactive displays, personal digital assistants (PDAs), portable digital assistants, enterprise digital assistants, personal navigation devices. network connected devices, Blu-ray players (or other optical disk players with network access), in-vehicle devices, televisions (set top boxes), virtual machines, and game consoles. *Likewise, the term devices used herein is intended to be synonymous.*

'250 Patent at 3:52–65 (emphasis added). Focusing on the last sentence of this excerpt, if "platform" and "device" are synonymous, the claim language requires identifying "device identities," not just device manufacturers or types.

Both the specification and the claim language bolster this conclusion. For one, the specification never refers to a "platform identity" or "device identity" as a type or brand of device.[4] Instead, the patents frame the problem around a user's ability to manage electronic information of "[d]issimilar formats compounded with increasing amounts of digital content [that] are overwhelming users with data." '250 Patent at 1:30–31. To address the problem, information relevant *to the user* is presented in channels, and the user interacts with those channels to transfer the channel content to his other registered devices. Reinforcing that idea, Claim 1 of the '250 Patent ties the "platform identities" to a user profile. *See* '250 patent at 15:6–12 ("deploying the secure user-

---

[4] At the hearing, Cyandia pointed to Figure 1 of the '948 Patent as support for the notion a brand can be a "platform identity." Hr'g Tr., Dkt. No. 97 at 35:15–20. That figure, however, shows multiple users (116), each which has a plurality of specific devices (118) that may be of multiple types, such a phone, a tablet, or a laptop. If anything, that supports SAP's position by associating multiple devices with specific users. Cyandia also emphasized the '250 Patent's title of "Apparatus and Method for Interacting With Multiple Information Forms Across Multiple Types of Computing Devices," *id.* at 35:4–7, but the title is consistent with the idea of a single user interacting with multiple information forms across his multiple devices of various types.

centric channel from the channel grid framework on the first platform to a second platform associated with the user in response to a user selecting the secure user-centric channel from the channel grid framework on the first platform and performing a copy operation of the secure user-centric channel to the second platform”). *See also* ’250 Patent Pros. History, Dkt. No. 78-5 at 18–19 (characterizing the invention as “allowing the user to make convenient changes to the user experience on one device of the user using another device of the user to provide a seamless experience between multiple platforms of the user”).

Cyandia’s reliance on Claim 8 of the ’265 Patent is not persuasive. That claim merely requires a device account that includes at least one of “a device name; a device type; a device manufacturer; a device model number; a device serial number; a device IP address; a device location; a device user; and a device password . . . .” ’285 Patent at 17:1–10. That language does not, however, inform what it means to “identify a device.” The last limitation of Claim 8, which recites “authenticating the at least one user platform if the platform identity matches the at least one entry,” ’285 Patent at 17:9–10, merely suggests the “platform identity” can include any one or more of attributes like name, type, manufacturer, model number and serial number, and the like, but it does *not* suggest each of those attributes by itself is sufficient to identify the platform.

Although the Court agrees with SAP on “platform identities,” there’s no basis for imposing a registration requirement. The claims only require the user profile to identify a specific device. They are agnostic as to whether that happens through registration or some other process. And none of the cites on which SAP relies change the ordinary meaning of “identify.” Accordingly, the Court construes the ordinary meaning of this term as “a user profile [identifying / to identify] . . . specific devices.”

**D. Term 7: "authenticating the user and the at least one user platform" ('250 Patent, Claims 1, 13); "authenticating the user and the at least one user platform . . . based at least in part on the user identity and the platform identity" ('285 Patent, Claims 1, 6, 9, 13, 18, 36, 37, 42; '948 Patent, Claim 23)**

| Cyandia's Construction | SAP's Construction |
|---|---|
| Plain and ordinary meaning | "verifying the user's identity and the identity of the user's device against predefined criteria specific to both the user and the devices registered in the user profile" |

This dispute centers on the meaning of "authenticating." SAP points to the specification and the prosecution history for support of its construction, which it says makes clear that the recited authentication process "extends beyond simple credential checks [and] requires the verification of whether the user's device meets predefined criteria [from] the user profile." Dkt. No. 78 at 8. In SAP's view, Cyandia's interpretation "erases the claimed device-specific authentication by the identity management server and improperly conflates user authentication with device authentication." *Id.*

Cyandia replies that "'authentication' of platforms . . . is commonly understood as validating something with credentials." Dkt. No. 80 at 5. It criticizes SAP's approach as "attempt[ing] to replace 'platform' with a specific, registered, user device." *Id.* at 5–6.

The Court has already addressed the scope of "platform" and whether it requires "registration" in a user profile. *See* Part IV.C. *supra*. Also, the meaning of "authentication" is clear. The Court agrees this claim limitation requires both "verifying the user's identity and the identity of the platform"—that is, the identity of a specific device.

**E. Term 8: "authenticating the second [computing device] platform to receive the . . . channel based at least in part on a second [computing device] platform identity for the second [computing device] platform" ('250 Patent, Claims 1, 13)**

**"authenticate the second computing device platform to receive the . . . channel based at least in part on a second computing device platform identity for the second computing device platform" ('250 Patent, Claim 25)**

| Cyandia's Construction | SAP's Construction |
|---|---|
| Plain and ordinary meaning. | "verifying the identity of a user's device that does not yet contain the specified channel against predefined criteria specific to the devices registered in the user profile" |

Most of the disputes concerning this claim language—that is, the meaning of "authentication" and whether "platform" refers to a specific device—have already been discussed *supra*. Accordingly, the Court will give this term a "plain and ordinary meaning" construction and address the scope of "second platform" *infra*.

**F. Term 9: "copy operation of the channel" ('250 Patent, Claims 1, 2, 13, 14, 25, 26)**

| Cyandia's Construction | SAP's Construction |
|---|---|
| Plain and ordinary meaning | "the act of duplicating the channel" |

SAP does not directly address this term in its response, but says the "core disagreement" revolves around Term 12. At the hearing, however, SAP accepted Cyandia's "plain and ordinary meaning" construction. Hr'g Tr., Dkt. No. 97 at 27:17–18.

**G. Term 10: "deploy[ing] the . . . channel" ('250 Patent, Claims 1, 6, 13, 25) "deploying the . . . information" ('285 Patent, Claims 1, 37, 42; '641 Patent, Claims 1, 31, 32)**

| Cyandia's Construction | SAP's Construction |
|---|---|
| Plain and ordinary meaning | "transfer[ring] a duplicated channel" / "transferring a duplicated information" |

As with the prior term, SAP does not directly address this term in its response, but says the "core disagreement" revolves around Term 12. Dkt. No. 78 at 11. At the hearing, however, SAP devoted substantial time to the meaning of "deploying." *See* Hr'g Tr., Dkt. No. 97 at 31:14–34–19.

This dispute wasn't sufficiently briefed for the Court to make a reasoned decision. For example, neither party presents evidence of the ordinary meaning of "deploying" in the context of computers or networking. At best, SAP points to embodiments from the patent as showing the meaning of "deploying," but even the discussion of those embodiments is amid arguments concerning the scope of "synchronizing." *See* Dkt. No. 78 at 11–12. Cyandia also appears to mix arguments about "synchronizing" and "deploying," essentially asserting "deploying" means only that information must be "made available on multiple platforms in order to synchronize it across the platforms." *See* Dkt. No. 75 at 13.

Ultimately, the claims provide sufficient detail to understand the scope of these phrases. Accordingly, the Court gives them "plain and ordinary meaning" constructions.

### H. <u>Term 11</u>: "the second platform"/ "the second computing device platform" ('250 Patent, Claims 1, 2, 6, 13, 14, 25, 26, 30)

| Cyandia's Construction | SAP's Construction |
| --- | --- |
| Plain and ordinary meaning | "a registered user device identified in the user profile that does not yet contain the specified channel" |

This dispute concerns the claims' requirement of "deploying [a] secure user-centric channel from the channel grid framework on the first platform to a *second platform* associated with the user." '250 Patent at 15:6–8 (emphasis added). SAP says its construction must be adopted "[f]or the claims to make sense." Dkt. No. 78 at 9. According to SAP, "[i]f the channel were already available on the second device, this whole exercise would be unnecessary." *Id.* It notes that, during prosecution, the applicants distinguished a cited reference because that reference did not teach "the channel is available on the second platform." *Id.* Cyandia replies it distinguished the reference on other grounds—"that the reference distributed software rather than deployed channels." Dkt. No. 80 at 7.

The question becomes whether one device can have multiple instances, so to speak, of the same "channel." While that may be somewhat pointless from a practical standpoint—like having two copies of the same magazine issue on a coffee table—nothing inherently limits "second platform" to in that way. Regarding the prosecution history, the applicants did not clearly distinguish the claims over the cited references on this basis. Instead, the applicants also distinguished the claims' "secure user-centric channel" and "second platform" from the cited reference's "software" and "networked computing systems," respectively. *See* '250 Patent Pros. History, Dkt. No. 78-5 at 9 ("Kodosky teaches a system for distributing software from a central console to networked computing systems . . . ."). Accordingly, the Court rejects SAP's disclaimer argument and will give this term a "plain and ordinary meaning" construction, which requires that the second platform is a

different platform than the first platform.

**I. Term 12: "synchronize functions and features . . . of channels across two or more of the . . . user platforms by deploying the . . . information to two or more of the plurality of user platforms" ('285 Patent, Claim 1)**

**"synchronizing functions and features of one or more . . . of channels across two or more of the . . . user platforms deploying the . . . information to two or more of the . . . user platforms to two or more of the plurality of user platforms" ('285 Patent, Claim 37, 42)**

**"synchronize functions and features . . . of channels across . . . user platforms by deploying . . . information to the plurality of user platforms" ('641 Patent, Claims 1, 31, 32)**

| Cyandia's Construction | SAP's Construction |
|---|---|
| Plain and ordinary meaning<br>("to maintain consistency of functions and features between two platforms") | "a process where the functions and features of channel(s) are duplicated across registered user device(s)" |

Claim 1 of the '285 Patent requires a processor "configured to synchronize functions and features of one or more of the plurality of channels across two or more of the plurality of user platforms by deploying the secure user-centric information to two or more of the plurality of user platforms." '285 Patent at 15:21–26. SAP says the intrinsic evidence shows "synchronizing" means "duplicating channels and transmitting that duplicated data across registered devices." Dkt. No. 78 at 11 (citing '250 Patent at 7:1–32). According to SAP, Cyandia stressed during prosecution that the invention differs from the mere data syncing disclosed in U.S. Patent 7,681,230 (O'Brien). *Id.* at 13.

SAP's arguments aren't persuasive. First, SAP fails to establish why the specific language from the specification to which it cites should limit the claims. At most, that language provides examples of synchronization. Second, the prosecution history fails to show a tie between the specific claim language at issue and the applicants' arguments. Instead, it appears to summarize the

respective inventions. *See* ’250 Patent Pros. History, Dkt. No. 78-5 at 18–19 (“O'Brien teaches a system for synchronizing data between secure electronic devices” rather than “allowing the user to make convenient changes to the user experience on one device of the user using another device of the user to provide a seamless experience between multiple platforms of the user.”). Moreover, each of the limitations already limits the manner of synchronizing to “deploying” and the subject of the synchronization to be “functions and features.” The Court will therefore give this term a “plain and ordinary meaning” construction.

### J. <u>Term 13</u>: “bi-directional interrogation” (’285 Patent, Claims 1, 37, 42; ’641 Patent, Claims 1, 31, 32)

| Cyandia’s Construction | SAP’s Construction |
|---|---|
| Plain and ordinary meaning<br>(“communicating, requesting, or questioning in two directions,” Dkt. No. 75 at 16) | “a process for reciprocal querying of content” |

Claim 1 of the ’285 Patent recites:

> wherein the transmission of the first authenticated channel information to the at least one user platform is based in part on a *bi-directional interrogation* of the at least one authorized channel,
>
> wherein the *bi-directional interrogation* comprises the at least one authorized channel interrogating an identity management server,
>
> and wherein the *bi-directional interrogation* further comprises the identity management server and a web services gateway interrogating the at least one authorized channel . . . .

’285 Patent at 15:55–65 (emphasis added). Other claims include similar language. *See, e.g.*, *id.* at 21:62–22:4 (Claim 37), 24:6–15 (Claim 42); ’641 Patent at 15:53–62 (reciting, in Claim 1, user-centric information “received based at least in part on a bi-directional interrogation of one or more of the plurality of authorized channels”), 20:44–52 (Claim 31), 21:26–34 (Claim 32), 22:44–52

(Claim 34).

The parties dispute (1) the breadth of "interrogation," with Cyandia suggesting it can simply be "communication," and (2) the extent of the relationship between both sides of the interrogation. Cyandia says "interrogation" means "communication, requesting, or questioning." Dkt. No. 75 at 16. Further, says Cyandia, SAP's suggestion of reciprocity—that is, some relationship between the queries—is unsupported. *Id.* at 17. Last, Cyandia objects to SAP's attempt to limit the querying to "content," which it says would exclude the function of "determining if services . . . of channels are available," as recited in Claim 36 of the '285 Patent. *Id.* at 18.

In response, SAP says "communication" is too broad, and that "interrogation" requires some evaluation or querying process. Dkt. No. 78 at 13–14. It distinguishes between a disclosed background process that "pushes data to the user devices, which ensures a good response time because network will not have to be continually interrogated for information." *Id.* at 14. In contrast, interrogation asks for content and elicits a response. *Id.* at 14–15. Regarding the supposed "reciprocal" nature of "bi-directional," SAP says the claims support this concept, and if one of the two queries fails, the transmission of information fails. *Id.* at 15.

The Court agrees with Cyandia on "reciprocity," but otherwise agrees with SAP. Cyandia provides no support for the notion that mere "communication" can be an "interrogation." And SAP agrees "content" is broad enough to address Cyandia's concerns. Dkt. No. 78 at 15. As for "reciprocity," SAP says this flows from the claim language itself. *Id.* at 14. That may be true, but the ordinary meanings of these words have no such requirement. The Court therefore construes this phrase as "querying of content in two directions."

### K. <u>Term 14</u>: "external device of the user" ('948 Patent, Claims 1, 13, 35, 36)

| Cyandia's Construction | SAP's Construction |
|---|---|
| Plain and ordinary meaning | "a registered user device identified in the user profile" |

Each of these claims recites the step of "receiving session data indicating a current state of at least one external device of the user." '948 Patent at 31:52–53; *see also id.* at 36:22–23, 37:10–11. SAP complains that Cyandia interprets "external device" as some unrelated or arbitrary device. Dkt. No. 78 at 9–10. Cyandia counters that SAP's construction wrongly injects a "registration" requirement into the claims." Dkt. No. 75 at 18.

The Court agrees with Cyandia. The first paragraph of SAP's response points to language that imposes additional limitations on the claim but not the phrase "external device of the user." Dkt. No. 78 at 9–10 (citing Claims 14, 24, and 25). The second paragraph, which relates to the specification, says nothing about "registration." *Id.* at 10. The cited example is a user's laptop, but the portion of the specification on which SAP relies fails to suggest the laptop must be "registered." SAP asks, "How else would the system detect the 'current state' of or transmit data to 'any user device that is external to the claim's primary system or apparatus'[?]" *Id.* But uncertainty concerning how a claimed invention might perform some task does not change the ordinary meanings of the words. Accordingly, the Court will give this term a "plain and ordinary meaning" construction.

### L. <u>Term 16</u>: "provide [an] alert" ('948 Patent, Claims 1, 35, 36)

| Cyandia's Construction | SAP's Construction |
|---|---|
| Plain and ordinary meaning | "present a tactile, auditory, or visual notification" |

The parties dispute whether an "alert" is limited to a "tactile, auditory, or visual notification." In fact, the parties even dispute whether SAP's construction broadens or narrows Cyandia's interpretation of the term. According to SAP, Cyandia's "'[p]lain meaning' does not

unambiguously convey the full scope of the claim term" and the '948 Patent "introduce[es] new matter, broadening the scope of 'provide an alert' from only using sight to also include using hearing and touch." Dkt. No. 78 at 16. Cyandia, however, hints that SAP's construction is *narrowing*, arguing "one of ordinary skill in the art would understand the scope of claimed alerts to be broad enough to encompass any type of alert." Dkt. No. 75 at 19–20 (quoting '948 Patent at 15:14–19 (explaining alert types "may include, but are not limited to, visual alerts, auditory alerts, tactile alerts, email messages, SMS text messages, activation of at least one channel of a plurality of channels, and notifications to a law enforcement agency")).

An "alert" should be limited to those that are "tactile, auditory, or visual." Moreover, if, as SAP agrees, "one of ordinary skill in the art would understand the scope of claimed alerts to be broad enough to encompass any type of alert," there's no reason to specifically call out types of alerts in the Court's construction. The Court will give this term a "plain and ordinary meaning" construction.

### M. Term 15: "intelligent alert object" ('250 Patent, Claim 9)

| Cyandia's Construction | SAP's Construction |
|---|---|
| Plain and ordinary meaning | Indefinite under § 112 ¶ 2 |

Claim 9 recites:

> configuring the channel grid framework to provide an *intelligent alert object*;
>
> comparing the evaluated content provided by the first computer application to a predetermined intelligent alert threshold condition; and
>
> displaying an alert condition on the first and second platforms when the evaluated content meets the predetermined threshold condition.

’250 Patent at 16:44–51 (emphasis added). SAP says a skilled artisan would not know whether “intelligent” is superfluous or whether there is some boundary between “intelligent” and “unintelligent” alerts. Dkt. No. 78 at 18. According to Cyandia’s expert, a skilled artisan would understand an “alert object” to be “intelligent” because the threshold condition is controlled by computer instructions. Dkt. No. 80 at 11.

A term is not indefinite if its meaning may be reasonably inferred from the patent. *See Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004) (“The failure to define [a] term is . . . not fatal, for if the meaning of the term is fairly inferable from the patent, an express definition is not necessary.”). Here, a skilled artisan would understand “intelligent” means the operations, when ultimately performed, are performed by a processor without human intervention. If a user were needed, the computer would not need any “intelligence.” The Court therefore construes “intelligent alert” as “alert with a threshold condition controlled by computer instructions.”

### N. <u>Term 17</u>: “service support instructions that determine how the secure user-centric channel behaves on at least the second platform” (’250 Patent, Claims 1, 13, 25; ’285 Patent, Claims 1, 37, 42; ’641 Patent, Claims 1, 19, 31–33; ’948 Patent, Claims 1, 35, 36)

| Cyandia’s Construction | SAP’s Construction |
|---|---|
| Definite; plain and ordinary meaning | Indefinite under § 112 ¶ 2 |

Claim 1 of the ’250 Patent recites a “deploying” step that itself requires “establishing a user profile identifying . . . service support instructions that determine how the secure user-centric channel behaves on at least the second platform.” ’250 Patent at 15:14–17. SAP questions whether this term encompasses all “instructions that determine how the secure user-centric channel behaves on at least the second platform.” Dkt. No. 78 at 18–19.

This term is not indefinite. "Service support" is simply a descriptive modifier added to "instructions." The rest of the limitations explain those "service support instructions." Nor does this limitation require the user profile to identify *all* service support instructions for the second platform. The Court will give this term a "plain and ordinary meaning" construction.

### O. __Term 18__: "if the user, the first . . . platform, and the second . . . platform are authenticated . . ." ('250 Patent, Claims 1, 13)

| Cyandia's Construction | SAP's Construction |
|---|---|
| Definite; plain and ordinary meaning | Indefinite under § 112 ¶ 2 |

The claims recite "authenticating a user and a first platform associated with the user" and "authenticating the second platform to receive the secure user-centric channel based at least in part on a second platform identity for the second platform." '250 Patent at 14:64–65, 15:20–22; *see also id.* at 17:25–27, 17:49–52. Substep D of the "deploying" step recites "if the user, the first platform, and the second platform are authenticated, transmitting to the second platform data used to deploy the secure user-centric channel." *Id.* at 15:23–25 (Claim 1), 17:54–58 (Claim 13). SAP says "[t]his is contradictory—saying something happens and then saying it may not have happened," and therefore indefinite.

The Court disagrees, in part because the claim language never says the authenticating "may not have happened." Instead, the claim language clarifies that the transmitting step must come after the two authentication steps. At worst, the "if" language is superfluous, which is not enough to hold a claim indefinite. Accordingly, the Court will give this team a "plain and ordinary meaning" construction.

**P. Term 31: "if the one or more events, conditions, logical workflows, discrete information values or signal data is/are determined in E)" ('948 Patent, Claims 1, 7, 35, 36)**

| Cyandia's Construction | SAP's Construction |
|---|---|
| Definite; plain and ordinary meaning | Indefinite under § 112 ¶ 2 |

This is the same argument made with respect to Term 18. For the same reasons, the term is not indefinite and the Court will give it a "plain and ordinary meaning" construction.

**Q. Term 19: "application host and transfer tool" ('250 Patent, Claim 25, 26, 30)**

| Plaintiff's Construction | SAP's Construction |
|---|---|
| Definite; plain and ordinary meaning | Indefinite under § 112 ¶ 2 |

SAP argues a skilled artisan would not know whether this is a means-plus-function term, so this claim is indefinite. Dkt. No. 78 at 20 (citing Manual of Patent Examining Procedure § 2181). Cyandia replies that a skilled artisan would understand the phrase to connote sufficiently definite structure to avoid means-plus-function treatment. And even if § 112 ¶ 6 applies, the specification describes the function of the host transfer tool. Dkt. No. 80 at 15 (citing '250 Patent at 5:32–43, 6:51–7:60, 9:22–38).

SAP has not shown this is a means-plus-function term. Instead, SAP asserts a skilled artisan wouldn't know whether to apply § 112 ¶ 6, but that's not the test. Rather, SAP has the burden to show the term fails to connote sufficiently definite structure to a skilled artisan, and if it doesn't meet that burden, § 112 will not apply. *Williamson*, 792 F.3d at 1348 (noting "the failure to use the word 'means' also creates a rebuttable presumption . . . that § 112, para. 6 does not apply"). Here, however, SAP doesn't even attempt to overcome the presumption. Regardless, the rest of the claim language sets forth the structure of the tool. *See* '250 Patent at 20:7–14 (requiring the tool to be

configured a certain way). This term will be given a "plain and ordinary meaning" construction.

**R. Term 24: "C) comprises authenticating the user and the user platform based at least in part on the user profile; and D) comprises transmitting the first authenticated channel information to the at least one user platform based at least in part on the user profile" ('285 Patent, Claims 5–10, 13)**

| Cyandia's Construction | SAP's Construction |
|---|---|
| Definite; plain and ordinary meaning | Indefinite under § 112 ¶ 2 |

Citing *TVnGO Ltd. (BVI) v. LG Elec. Inc.*, 861 F. App'x 453 (Fed. Cir. 2021), SAP says dependent Claims 5–10 and 13 directly conflict with Claim 1. Given that conflict, SAP asks the Court to hold all of these claims indefinite based on "irreconcilable inter-claim conflicts." Dkt. No. 78 at 22.

Steps C and D of Claim 1 recite:

> C) controlling the at least one communication interface to receive, from the at least one user platform of the plurality of user platforms, a user identity for the user and a platform identity for the at least one user platform;
>
> D) authenticating the user and the at least one user platform to receive the secure user-centric information based at least in part on the user identity and the platform identity . . . .

'285 Patent at 15:32–40. Claim 5 then recites "C) comprises authenticating the user and the user platform based at least in part on the user profile; and D) comprises transmitting the first authenticated channel information to the at least one user platform based at least in part on the user profile." *Id.* at 16:40–45. SAP says Claim 5 conflicts with Claim 1 by limiting the "controlling" step of Claim 1 to require authenticating (despite that step D recites "authenticating") and the "authenticating" step of Claim 1 to "transmitting."

Cyandia replies there is no contradiction because Steps C and D are both part of the

authentication process. Dkt. No. 80 at 15. According to Cyandia, Claim 5, when read with Claim 1, recites (Claim 5 language in blue):

> C) controlling the at least one communication interface to receive, from the at least one user platform of the plurality of user platforms, a user identity for the user and a platform identity for the at least one user platform;
>
> authenticating the user and the user platform based at least in part on the user profile;
>
> D) authenticating the user and the at least one user platform to receive the secure user-centric information based at least in part on the user identity and the platform identity;
>
> transmitting the first authenticated channel information to the at least one user platform based at least in part on the user profile.[5]

The Court agrees with Cyandia. To start, SAP has not shown a basis for the proposition that a so-called inter-claim conflict of this type invalidates all of the supposedly conflicting claims. In *TVnGO*, which is the only case on which SAP relies, the court found that the same term used in two different claims in two different ways led to uncertainty about the term's meaning. The court therefore held all claims in which the term appeared indefinite. *TVnGO Ltd.*, 861 F. App'x at 460. Here, however, SAP does not show that the alleged conflict makes the meaning of a term uncertain. Thus, even if the Court were to consider Claim 5 inconsistent with Claim 1, it would at most hold Claim 5 invalid as *internally* inconsistent because it incorporates all of Claim 1's limitations.

Regardless, Cyandia's reading of Claim 5 reasonable, especially if one considers "A)" through "E)" as connoting an order. Reciting in Claim 5 that "C) comprises authenticating the user and user platform" makes sense because that authentication would happen after the user and

---

[5] *See* Slide 75 of Cyandia's hearing presentation.

platform identities are received, as recited in Step C) of Claim 1. Similarly, reciting in Claim 5 that "D) comprises transmitting the first authenticated channel" makes sense because Step D) of Claim 1 authenticates the user and platform to receive the secure user-centric information. In contrast, SAP correctly notes it makes no sense to interpret the "receiving" or "authenticating" steps of Claim 1 as themselves including the "authenticating" and transmitting" steps, respectively, of Claim 5. Thus, because there is only one reasonable way to read Claim 5, it is not indefinite, and the Court will give it a "plain and ordinary meaning" construction.

**S. Term 25: "C) comprises authenticating the user and the at least one user platform based at least in part on the plurality of user accounts and the plurality of device accounts included in the authentication directory" ('285 Patent, Claim 38)**

| Cyandia's Construction | SAP's Construction |
|---|---|
| Definite; plain and ordinary meaning | Indefinite under § 112 ¶ 2 |

This dispute tracks the dispute set forth *supra* for Term 24. For the same reasons, the Court holds this term is not indefinite and receives a plain and ordinary meaning construction.

**T. Term 26: "the at least one processor is configured to synchronize functions and features of one or more of the plurality of channels across two or more of the plurality of user platforms by deploying the secure user-centric information to two or more of the plurality of user platforms" ('285 Patent, Claim 1)**

| Cyandia's Construction | SAP's Construction |
|---|---|
| Definite; plain and ordinary meaning | Indefinite under § 112 ¶¶ 2, 6 |

SAP argues this is a means-plus-function term without any disclosed structure. Dkt. No. 78 at 22. Because of the absence of the word "means," SAP has the burden of showing this is a § 112 ¶ 6 term. Despite that, it makes no attempt to show a skilled artisan would *not* understand the limitation as connoting sufficiently definite structure. "[S]tructure can be recited in various ways,

including [by using] a description of the claim limitation's operation and 'how the function is achieved in the context of the invention.'" *Dyfan*, 28 F.4th at 1366 (Fed. Cir. 2022) (quoting *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1299 (Fed. Cir. 2005)). Yet SAP makes no attempt to identify any such structure. At a minimum, however, the claim itself explains how it performs the function of synchronization—"by deploying the secure user-centric information to two or more of the plurality of user platforms." Because SAP has not met its burden, the Court will give this term a "plain and ordinary meaning" construction.

### U. <u>Term 28</u>: "the at least one external computing device is configured to synchronize functions and features of one or more of the plurality of channels across a plurality of user platforms by deploying secure user-centric information to the plurality of user platforms" ('641 Patent, Claims 1, 31–33)

| Cyandia's Construction | SAP's Construction |
|---|---|
| Definite; plain and ordinary meaning | Indefinite under § 112 ¶¶ 2, 6 |

This dispute tracks the dispute set forth *supra* for Term 26. For the same reasons, the Court holds this term is not indefinite and will give it a "plain and ordinary meaning" construction.

### V. <u>Term 30</u>: "D) receiving session data indicating a current state of at least one external device of the user . . . F) determining a notification method by which to provide at least one alert on the at least one external device based on the current state of the at least one external device indicated by the session data; G) . . . the notification data is configured to cause the at least one external device to provide the at least one alert on the at least one external device; and H) controlling the at least one communication interface to transmit the notification data to the at least one external device" ('948 Patent, Claim 1, 35, 36)

| Cyandia's Construction | SAP's Construction |
|---|---|
| Definite; plain and ordinary meaning | Indefinite under § 112 ¶ 2 |

SAP says these claims conflict with the specification, which would make a skilled artisan unclear about whether they have an error. Dkt. No. 78 at 23. Specifically, Step D) requires

"receiving session data indicating a current state of at least one external device of the user." '948 Patent at 31:52–53. But if session data indicates the user's laptop is off, the claimed apparatus nonetheless provides an alert. Dkt. No. 78 at 24. The specification, however, describes providing an alert on the user's *active* devices. *Id.*

These claims are not indefinite. SAP does not argue some part of the claim language is itself unclear. Nor has SAP shown the claims contain an error. At best, SAP presents a non-infringement question—whether a device in an "off" or "inactive" state provides an alert—but this is not a claim construction issue. The Court will give this term a "plain and ordinary meaning" construction.

### W. <u>Term 32</u>: "if the one or more events conditions, logical workflows, discrete information values or signal data is/are determined in E), the at least one processor performs H)" ('948 Patent, Claims 1, 2, 4, 13)

| Cyandia's Construction | SAP's Construction |
|---|---|
| Definite; plain and ordinary meaning | Indefinite under § 112 ¶ 2 |

SAP asserts Claim 1 is indefinite, and therefore Claim 13 is also indefinite because it depends from Claim 1. The basis for the challenge stems from Claims 2 and 4. Together, Claims 1–4 recite:

> E) monitoring at least the first channel information so as to determine one or more events, conditions, logical workflows, discrete information values or signal data, based on at least one threshold condition or parameter relating to the first channel information and determined based on the user preferences indicated by the configuration data; and
>
> if the one or more events, conditions, logical workflows, discrete information values or signal data is/are determined in E):
>
> F) determining a notification method by which to provide at least one alert on the at least one external device based on the

current state of the at least one external device indicated by the session data;

G) generating notification data according to the determined notification method, wherein the notification data is configured to cause the at least one external device to provide the at least one alert on the at least one external device; and

H) controlling the at least one communication interface to transmit the notification data to the at least one external device via the first channel without being requested by the user, wherein the transmission of the notification data to the at least one external device is based at least in part on information access rights and/or security protocols respectively associated with the corresponding plurality of authorized channels, the user, and the at least one user platform.

2. The apparatus of claim 1, wherein if the one or more events, conditions, logical workflows, discrete information values or signal data is/are determined in E), the at least one processor performs H).

3. The apparatus of claim 1, wherein if the one or more events, conditions, logical workflows, discrete information values or signal data is/are determined in E), the at least one processor controls the at least one memory so as to store trigger information relating to the one or more determined events, conditions, logical workflows, discrete information values or signal data.

4. The apparatus of claim 3, wherein if the one or more events, conditions, logical workflows, discrete information values or signal data is/are determined in E), the at least one processor further performs H).

’948 Patent at 31:54–32:30.

Claim 1 requires the recited processor to perform each of F), G), and H) “if the one or more events, conditions, logical workflows, discrete information values or signal data is/are determined in E).” ’948 Patent at 31:61–63. But, says SAP, Claim 2 contradicts Claim 1 by requiring that “if

the one or more events, conditions, logical workflows, discrete information values or signal data is/are determined in E), the at least one processor performs H).” Dkt. No. 78 at 24. Because a skilled artisan “would not know which claim to believe,” Claim 1 is invalid. *Id.* And because Claim 1 is invalid, Claim 13, which depends from Claim 1, is also invalid. *Id.*

Cyandia replies that there is no inter-claim conflict because “Claim 1 requires a notification method to be determined based on the event (Step F) and Claim 2 requires the notification to be transmitted based on the event (Step H).” Dkt. No. 80 at 20. In other words, Cyandia says Claim 1 only requires performance of Step F) when the “if” condition is satisfied, so there is no inter-claim conflict.

To start, the Court agrees with SAP that Claim 1 requires the performance of steps F), G), and H) if the “if” condition at lines 61–63 is met. Notably, the “if” clause is immediately preceded by “and,” which suggests it is the final limitation of the claim. Similarly, the “and” at the end of Step G) suggests Step H) is the last subpart of the “if” clause. Also, the indentation of Steps F), G), and H) relative to the “if” clause is the same.[6] Finally, it makes sense that if the condition is met, the device would determine a notification method, then generate notification data, and finally transmit the notification data, as set forth sequentially in Steps F)–G).

This conclusion does not, however, render Claim 1 indefinite. SAP incorrectly works backwards by assuming Claim 2 narrows Claim 1, without making such a showing. By doing so, SAP ignores the possibility that Claim 2 might *not* narrow Claim 1, in which case Claim 2 would be

[6] During his deposition, Cyandia’s expert stated he had been told that indentation is not a part of the claim, so “it’s not strictly required that H is conditioned on the conditions that happen from Line 61 to 63 [of Column 31].” Goodrich Depo. Tr., Dkt. No. 80-5 at 42:21–14. Cyandia, however, points to no case law that supports that position.

invalid—not Claim 1.

This is not, as SAP puts it, a question of "which claim to believe." Rather, "[a] dependent claim that contradicts, rather than narrows, the claim from which it depends is invalid." *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1362 (Fed. Cir. 2016) (citing 35 U.S.C. § 112(d)). Accordingly, SAP has not shown Claim 1 is indefinite, so neither is Claim 13.

## V. CONCLUSION

| Term | Disputed Term | The Court's Construction |
|---|---|---|
| 1 | "secure user-centric"<br>('250 Patent, Claims 1, 25;<br>'285 Patent, Claims 1, 13, 37, 42;<br>'641 Patent, Claims 1, 2, 13, 18, 31, 32;<br>'948 Patent, Claims 1, 13, 35, 36) | **"secure":** "inaccessible without authorization"<br>**"user-centric":** "based on the identity of, and relevant to, a user" |
| 2 | "channel"<br>('250 Patent, Claims 1, 2, 4, 6, 9, 13, 14, 25, 26, 30;<br>'285 Patent, Claims 1, 6, 9, 13, 18, 36, 37, 42;<br>'641 Patent, Claims 1, 2, 13, 16, 18, 31, 32, 34;<br>'948 Patent, Claims 1, 7, 11, 13, 35, 36) | "a conduit for accessing and interacting with information, comprising a visual component to be presented on the at least one user [platform/device] and an information delivery component on an application server" |
| 6 | "a user profile identifying . . . platform identities"<br>('250 Patent, Claims 1, 13, 25;<br>'285 Patent, Claims 1, 37, 42; '641 Patent, Claims 1, 31, 32)<br><br>"a user profile to identify . . . platform identities"<br>('948 Patent, Claims 1, 35, 36) | "a user profile [identifying / to identify] . . . specific devices" |

| | | |
|---|---|---|
| 7 | "authenticating the user and the at least one user platform"<br>('250 Patent, Claims 1, 13)<br><br>"authenticating the user and the at least one user platform . . . based at least in part on the user identity and the platform identity"<br>('285 Patent, Claims 1, 6, 9, 13, 18, 36, 37, 42; '948 Patent, Claim 23) | "verifying the user's identity and the identity of the platform" |
| 8 | "C) authenticating the second [computing device] platform to receive the . . . channel based at least in part on a second [computing device] platform identity for the second [computing device] platform"<br>('250 Patent, Claims 1, 13)<br><br>"authenticate the second computing device platform to receive the . . . channel based at least in part on a second computing device platform identity for the second computing device platform"<br>('250 Patent, Claim 25) | Plain and ordinary meaning |
| 9 | "copy operation of the channel"<br>('250 Patent, Claims 1, 2, 13, 14, 25, 26) | Plain and ordinary meaning |
| 10 | "deploy[ing] the . . . channel"<br>('250 Patent, Claims 1, 6, 13, 25)<br><br>"deploying the . . . information" (Term 10)<br>('285 Patent, Claims 1, 37, 42;<br>'641 Patent, Claims 1, 31, 32) | No construction necessary other than as set forth for Term 12 |

| | | |
|---|---|---|
| 11 | "the second platform"/ "the second computing device platform"<br>('250 Patent, Claims 1, 2, 6, 13–14, 25–26, 30) | Plain and ordinary meaning |
| 12 | "synchronizing functions and features of one or more . . . of channels across two or more of the . . . user platforms deploying the . . . information to two or more of the . . . user platforms to two or more of the plurality of user platforms"<br>('285 Patent, Claim 1)<br><br>"synchronize functions and features . . . of channels across two or more of the . . . user platforms by deploying the . . . information to two or more of the plurality of user platforms"<br>('285 Patent, Claim 37, 42)<br><br>"synchronize functions and features . . . of channels across . . . user platforms by deploying . . . information to the plurality of user platforms"<br>('641 Patent, Claims 1, 31, 32) | Plain and ordinary meaning |
| 13 | "bi-directional interrogation"<br>('285 Patent, Claims 1, 37, 42;<br>'641 Patent, Claims 1, 31, 32) | "querying of content in two directions" |
| 14 | "external device of the user"<br>('948 Patent, Claims 1, 13, 35, 36) | Plain and ordinary meaning |
| 16 | "provide [an] alert"<br>('948 Patent, Claims 1, 35, 36) | Plain and ordinary meaning |
| 15 | "intelligent alert object"<br>('250 Patent, Claim 9) | **"intelligent alert":** "alert with a threshold condition controlled by computer instructions" |

| | | |
|---|---|---|
| 17 | "service support instructions that determine how the secure user-centric channel behaves on at least the second platform"<br>('250 Patent, Claim 1, 13, 25;<br>'285 Patent, Claim 1, 37, 42;<br>'641 Patent, Claim 1, 19, 31–33;<br>'948 Patent, Claim 1, 35, 36) | Plain and ordinary meaning |
| 18 | "if the user, the first . . . platform, and the second . . . platform are authenticated . . ."<br>('250 Patent, Claims 1, 13) | Plain and ordinary meaning |
| 19 | "application host and transfer tool"<br>('250 Patent, Claims 25, 26, 30) | Plain and ordinary meaning |
| 24 | "C) comprises authenticating the user and the user platform based at least in part on the user profile; and D) comprises transmitting the first authenticated channel information to the at least one user platform based at least in part on the user profile"<br>('285 Patent, Claims 5–10, 13) | Plain and ordinary meaning |
| 25 | "C) comprises authenticating the user and the at least one user platform based at least in part on the plurality of user accounts and the plurality of device accounts included in the authentication directory"<br>('285 Patent, Claim 38) | Plain and ordinary meaning |
| 26 | "the at least one processor is configured to synchronize functions and features of one or more of the plurality of channels across two or more of the plurality of user platforms by deploying the secure user-centric information to two or more of the plurality of user platforms"<br>('285 Patent, Claims 1, 6, 9, 13, 18, 36) | Plain and ordinary meaning |

| | | |
|---|---|---|
| 28 | "the at least one external computing device is configured to synchronize functions and features of one or more of the plurality of channels across a plurality of user platforms by deploying secure user-centric information to the plurality of user platforms"<br>('641 Patent, Claims 1, 31–33) | Plain and ordinary meaning |
| 30 | "D) receiving session data indicating a current state of at least one external device of the user . . . F) determining a notification method by which to provide at least one alert on the at least one external device based on the current state of the at least one external device indicated by the session data; G) . . . the notification data is configured to cause the at least one external device to provide the at least one alert on the at least one external device; and H) controlling the at least one communication interface to transmit the notification data to the at least one external device"<br>'948 Patent, Claim 1, 35, 36 | Plain and ordinary meaning |
| 31 | "if the one or more events, conditions, logical workflows, discrete information values or signal data is/are determined in E)"<br>('948 Patent, Claims 1, 7, 35, 36) | Plain and ordinary meaning |
| 32 | "if the one or more events, conditions, logical workflows, discrete information values or signal data is/are determined in E), the at least one processor performs H)"<br>('948 Patent, Claims 1, 2, 4, 13) | Claim 13 is not invalid. |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 7th day of August, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE